UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN FRANK ANDRADE, | No. C 11-3528 SI (pr) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |
| v. | |
| GREG LEWIS, warden; et al., | |
| Defendants. | |

## INTRODUCTION

In this *pro se* prisoner's civil rights action, Adrian Frank Andrade alleged due process violations during the proceedings that led to his placement in administrative segregation in 2008 as a result of being validated as a prison gang associate. Defendants now move for summary judgment on the federal due process claims. For the reasons discussed below, the court grants the motion. Judgment will be entered in favor of all defendants on the federal claims and the state law claims will be dismissed.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

The Northern Structure is a prison gang.

On November 5, 2008, prison officials removed Andrade from the Pelican Bay State Prison general population and placed him in administrative segregation. At the time, he was provided a CDC-114 form (i.e., an administrative segregation unit placement notice) that informed him he was being placed in administrative segregation pending an investigation of his

suspected involvement with the Northern Structure prison gang. Docket # 1 at 6.

On November 8, 2008, prison officials disclosed to Andrade the seven documents they thought demonstrated his involvement in the Northern Structure prison gang. Two of the documents were provided to him and he was given notice of each of the other five documents via a CDC-1030 form (i.e., confidential information disclosure form) that notified him that confidential information relating to him had been received and put in his file. Each CDC-1030 described in general the document, and stated the basis for the determination that the source of the information was reliable. The seven source items prison officials disclosed to Andrade were:

(1) A drawing found in Andrade's property during a November 5, 2008 cell search and a November 6, 2008 memorandum describing the perceived significance of the drawing. The photocopied drawing had the name and prisoner number of Ricky Gonzales, a validated Northern Structure gang member, handwritten on it. The page with the drawing on it had markings indicating it was downloaded from the internet on March 5, 2006, although there was no way to know when Gonzales' name and number were written on the drawing. According to the memorandum, gang members often exchange photos or drawings in order to show a higher level of status to other members/associates; Andrade's possession of the drawing meant that he engaged in some sort of transaction with another inmate; and his possession showed continued allegiance with NS associates and members, especially Gonzales.

(2) An April 2, 2008 memorandum stating that Andrade was on the exercise yard "and someone was calling cadence," i.e., calling out numbers to keep a group of people exercising in a synchronized manner. *See* Docket # 1 at 8; Docket # 54 at 10. (This item ultimately was rejected for validation purposes.)

(3) A CDC-1030 disclosing an October 22, 2008 memorandum by C/O Drown.[1] This memorandum described a Northern Structure roster confiscated from another

---

[1] The CDC-1030 provided the wrong prisoner number for Andrade in describing the October 22, 2008 memorandum, i.e., the CDC-1030 referred to him as "ANDRADE T-89638," whereas the plaintiff Andrade's prisoner number is F-37810. Docket # 1 at 18. Andrade pointed out this inconsistency in his written rebuttal. Docket # 66 at 23. Defendants have presented evidence that this was a typographical error on the CDC-1030, and that the October 22, 2008 memorandum used Andrade's correct prisoner number. Docket # 53 at 4. The court has reviewed *in camera* the October 22, 2008 memorandum and the roster to which it refers. *See* Docket # 63-5. The October 22, 2008 memorandum uses plaintiff

2

inmate that included Andrade's name, prisoner number and personal information. According to the memorandum, Andrade's inclusion on the roster signaled that he was an inmate willing to function directly under the authority of the Northern Structure prison gang.

(4) A CDC-1030 disclosing an October 22, 2008 memorandum by C/O Cleary. This memorandum described a roster of inmates in good standing with the Northern Structure prison gang confiscated from another inmate that included Andrade's name, prisoner number and personal information.

(5) A CDC-1030 disclosing a September 21, 2008 memorandum. This memorandum described inmate notes obtained by prison staff from a Northern Structure-affiliated inmate, including another roster. The roster had Andrade's name, prisoner number and personal information.

(6) A CDC-1030 disclosing a November 27, 2007 memorandum regarding another Northern Structure roster provided to prison staff by a validated Northern Structure member. This roster listed Andrade's name, prisoner number and personal information.

(7) A CDC-1030 disclosing an April 15, 2008 memorandum that described a staff interview with a confidential informant. According to the memorandum, Andrade was identified by the informant as forming part of the Northern Structure's chain-of-command as a squad member. According to the CDC-1030, "[t]o hold a position of Squad Member means the individual is functioning under the policies, procedures, rules, and authority of the NS [Northern Structure]." Docket # 1, Ex. D.

When the evidence against him was disclosed to him, Andrade was provided with a rebuttal form by correctional officer J. Silveira. Docket # 1 at 8. Andrade was then given 24 hours to prepare a defense to challenge the evidence and dispute the charge that he was affiliated with the prison gang. Andrade filled out the rebuttal form in which he presented four pages of argument against the use of the documents described above. Docket # 66 at 23-27. Andrade

---

Andrade's correct prisoner number. The roster is somewhat difficult to read, but appears to use the correct prisoner number, and also uses Andrade's first, middle and last name. There is no triable issue of fact on this point: the parties are in agreement that the CDC-1030 has the wrong CDC prisoner number. The validation was, however, based not on the CDC-1030 but instead on the underlying document that *did* have the correct number.

3

1 wanted also to "confront" Silveira because the CDC-1030 for the October 22, 2008 memorandum listed another inmate's number (as discussed in footnote 1, above) and because there was an erroneous date for another piece of evidence.[2] Docket # 68 at 1-2. He did, however, make those points in his written rebuttal. *See* Docket # 18-1 (§ 2 and § 7). When C/O Silveira returned to collect the rebuttal form the next day, Andrade had no objections to the validation materials other than the objections noted on the written rebuttal form. According to Andrade, he handed the rebuttal to Silveira, and Silveira "then asked if that was it right there pertaining to my rebuttal form (CDC 128-B) I responded 'that[']s it right there.'" Docket # 68 at 2. Andrade was unaware of the process used and thought Silveira would return for another visit, but never mentioned that to Silveira and Silveira did not return. *Id.*

Prison officials then reviewed the documents regarding Andrade's suspected gang involvement. On or about November 19, 2008, correctional officer Silveira of the Institutional Gang Investigations unit signed a gang status review form that stated, "[a]fter a thorough review of the evidence, I have concluded that Adrian ANDRADE aka 'Dopey from SAC Fruitridge' is actively participating as an associate of the NS prison gang." Docket # 68 at 5. Correctional lieutenant J. McKinney of the Institutional Gang Investigations unit approved the conclusion. *Id.* Of the seven items earlier disclosed to Andrade, the validation was based on six of them, and excluded only the April 2, 2008 memorandum about someone calling cadence in the yard. That same form stated that a copy of all the documents used in the validation and written response was supplied to Andrade on November 19, 2008. Prison officials then forwarded the validation package to the Office of Correctional Safety ("OCS") for review.

On December 8, 2008, the OCS informed Andrade that it had approved his validation, finding six of the seven source items adequate. Docket # 1 at 8. The OCS did not rely on the April 2, 2008 memorandum about inmates exercising to someone calling cadence. On December 9, 2008, Andrade received a form confirming that he had been validated as an associate of the

---

[2] Although Andrade received a CDC-1030 for a "Confidential Memorandum dated November 27, *2007*, authored by Correctional Officer J. Hernandez," the notice and written rebuttal form identified it as a "Confidential Memorandum dated November 27, *2008*, Authored by Correctional Officer J. Hernandez." *Compare* Docket # 1 at 21 *with* Docket # 66 at 25 (emphasis added).

Northern Structure prison gang. *Id.* ; *see also* Docket # 53 (Buechner Decl.), and # 53-1.

On February 18, 2009, the Institutional Classification Committee ("ICC") met to determine an appropriate placement for Andrade. Andrade appeared before the ICC. The ICC determined that Andrade would be transferred to Pelican Bay for indefinite confinement in the security housing unit ("SHU").

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because some of the events or omissions giving rise to the claims occurred in Del Norte County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Plaintiff's complaint is verified and therefore may be considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

## DISCUSSION

A. <u>Due Process Claims</u>

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. Changes in conditions of confinement for a prison inmate may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of real substance. *Sandin v. Conner*, 515 U.S. 472, 477-87 (1995). The court assumes for purposes of the pending motion that Andrade's placement in the SHU, which has resulted in extremely restrictive housing conditions for an indefinite period of time, amounts to a deprivation of a liberty interest of real substance. *See generally Wilkinson v. Austin*, 545 U.S. 209, 223 (2005).

1. <u>Plaintiff's Opportunity to Present His Views</u>

When prison officials initially determine whether a prisoner is to be segregated for administrative reasons and a liberty interest of real substance is implicated, due process requires

6

1 that they hold an informal nonadversary hearing within a reasonable time after the prisoner is
2 segregated, inform the prisoner of the charges against him or the reasons segregation is being
3 considered, and allow the prisoner to present his views. *Toussaint v. McCarthy*, 801 F.2d 1080,
4 1100 (9th Cir. 1986). The person to whom the prisoner presents his views must be the critical
5 decision-maker. *See Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir. 1994). Because classification
6 committees might be "predisposed to transfer any validated inmate to the SHU," the prisoner's
7 meeting with the investigator of his case, who prepares the gang validation packet and forwards
8 his determination that the prisoner is involved with a gang to the reviewing department, is the
9 critical point. *See Madrid v. Gomez*, 889 F.Supp. 1146, 1277 (N D. Cal. 1995).

10 Andrade has failed to show a triable issue of fact in support of a claim that he was not
11 allowed to present his views to the critical decision-maker. The evidence is undisputed that
12 defendant Silveira performed the institutional gang investigation tasks for the validation of
13 Andrade and therefore was the critical decision-maker. The evidence is undisputed that Silveira
14 provided to Andrade a form for him to write his rebuttal to the source items that were being
15 considered in the validation, and that Andrade wrote out his rebuttal and handed it back to
16 Silveira. Andrade does not does not dispute that Silveira asked whether Andrade had anything
17 further to add to the rebuttal, and Andrade responded that he did not and that all his information
18 was in the written rebuttal. *See* Docket # 68.

19 Andrade appears to urge that due process required that he have a chance to *orally* present
20 his views. His federal due process right is a right to present his views to the critical decision-
21 maker, and there is no requirement that those views be presented orally as well as in written form,
22 or orally instead of in written form. There might be occasions where an oral presentation is
23 needed – e.g., for an illiterate inmate – but that is not Andrade's situation. The requirement that
24 prison officials allow the prisoner to present his views exists so that the prisoner may convey
25 information to officials, and that purpose was served here by Andrade's lengthy written rebuttal.
26 Moreover, Andrade essentially admits that an oral presentation would have added nothing: he
27 would have just reiterated what he already had said in his written rebuttal if he had talked to
28 Silveira. Docket # 54-1 at 15. Andrade's own evidence shows that he was not denied an

7

opportunity to present his views. He concedes that he did not understand the process and thought Silveira would return, but presents no evidence that prison officials suggested there would be multiple visits. His efforts to show what occurred in other inmates' validation proceedings do not help him because they fail to raise a triable issue of fact about the constitutionality of his own validation proceedings.

Andrade also urges that prison officials failed to meaningfully consider the evidence at the three points at which there were "momentous reviews," i.e., when Silveira looked at the evidence, when the OCS examined the case, and when the ICC made the SHU placement decision. Docket # 66 at 1, 8. He asserts that the fact that he was allowed to provide a written rebuttal to the evidence "does not prove they reviewed or at best meaningfully reviewed it." *Id.* But this assertion could be made by anyone who failed to prevail in an administrative or judicial proceeding. A losing party who asserts that the adjudicating entity didn't really consider the evidence does not show a triable issue of fact simply by making the assertion. The fact that Andrade may not have been believed did not render the reviews meaningless or deny him procedural due process. *Accord Madrid*, 889 F. Supp. at 1277 (rejecting claim of systemic failure to provide meaningful review hearings).

### 2. Some Evidence Supports The Validation Decision

Due process requires that there be an evidentiary basis for the prison officials' decision to place an inmate in segregation for administrative reasons. See *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *Toussaint*, 801 F.2d at 1104-05. This standard is met if there is "some evidence" from which the conclusion of the administrative tribunal could be deduced. *Superintendent v. Hill*, 472 U.S. at 455; *Toussaint*, 801 F.2d at 1105. The "some evidence" standard applies to an inmate's placement in SHU for gang affiliation. *See Bruce v. Ylst*, 351 F.3d 1283, 1287-88 (9th Cir. 2003). Ascertaining whether the standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence. *See Toussaint*, 801 F.2d at 1105. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached.

8

There is some authority for the proposition that the evidence relied upon to confine an inmate to the SHU for gang affiliation must have "some indicia of reliability" to satisfy due process requirements. *See Madrid*, 889 F. Supp. at 1273-74; *see also Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) (considering accuracy of polygraph results when used as evidence to support placement in administrative segregation); *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987) (evidence relied upon by a prison disciplinary board must have "some indicia of reliability"). Assuming that the reliability requirement applies to an administrative segregation decision, if the information relied upon by the decision-maker is a statement of an unidentified informant, due process requires that the record contain some factual information from which the committee can reasonably conclude that the information was reliable *and* a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name. *See Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987). Reliability may be established by: (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) *in camera* review of the documentation from which credibility was assessed. *Id.* at 186-87. "Proof that an informant previously supplied reliable information is sufficient." *Id.* at 187.

Andrade has not shown a triable issue of fact as to whether there was some evidence to support the decision to validate him. It is undisputed that six pieces of evidence were used to conclude that Andrade met the criteria for validation as an associate of the Northern Structure prison gang. The six pieces of evidence – individually and collectively – provided some evidence to support the validation decision. Those items provided evidence that Andrade had in his possession the name and inmate number of a validated Northern Structure member; Andrade was on several Northern Structure prison gang rosters; and Andrade was part of the Northern Structure's chain-of-command. *See Castro v. Terhune*, 712 F.3d 1304, 1315 (9th Cir. 2013) (possession of a birthday card for another inmate who was a validated member of the same gang signed by plaintiff and other gang associates was some evidence); *id.* (debriefing reports from

9

interviews of inmates who testified from personal knowledge regarding plaintiff's involvement in gang-related activities provided some evidence to support the validation decision).

The six source items used by prison officials to conclude that Andrade met the criteria for validation as an associate of the Northern Structure prison gang fit within the CDCR's criteria for evidence of association that could be used for validation under the regulation, which provided in 2008:

> The determination of a gang identification shall reference each independent source item in the inmate/parolee's central file. The sources shall be based on the following criteria: . . .
>
> (C) Written material. Any material or documents evidencing gang affiliation such as the membership or enemy lists, constitutions, organizational structures, codes, training material, etc., of specific gangs. Staff shall articulate why, based on either the explicit or coded content, the written material is reliable evidence of association or membership with the gang. . . .
>
> (G) Association. Information related to the inmate/parolee's association with validated gang affiliates. Information including addresses, names, identities and reasons why such information is indicative of association with a prison gang or disruptive group. . . .

15 Cal. Code Regs. § 3378(c)(8) (2008 version).

Andrade makes several arguments against the evidence, but none of them enable him to avoid summary judgment. He offers an alternate interpretation of the drawing that was used to validate him.[3] He urges that he had the drawing for artistic utility rather than because it had a gang member's name and CDC number on it, but that does not help him here because a reviewing court does not decide anew whether to validate him, but only whether there was some evidence with sufficient indicia of reliability to support the decision reached by the defendants.

Andrade also argues that the documents used to validate him as a gang associate must show that he was engaged in "gang activity." He is wrong on the law: a document need not show that the inmate engaged in or directed actual criminal activity or "gang activity" for that document to be used to validate an inmate as a gang member or associate. Although evidence

---

[3]Defendant Silveira declared that the possession of the drawing and Gonzales' name and number thereon "proved that a transaction was made either between the two or through a third party also affiliated with the NS gang. Gang members often exchange photos or drawings in order to show a higher level of status to other members or associates within the gang. By possessing this drawing and Gonzales' name and CDCR number, Plaintiff was showing continued allegiance with NS associates and members, especially Gonzales." Docket # 64 at 11-12.

10

of criminal activity or gang activity may be used to validate an inmate, those are not the only forms of evidence that may be used. *See* 15 Cal. Code Regs. § 3000 ("gang" defined), § 3378(c) (2008 version) (gang involvement investigation and sources), § 3378(c)(4) (2008 version) (requirements to be validated as gang "associate"). In light of the well-recognized danger posed by prison gangs, prison officials properly could determine that, by being affiliated with a gang, the inmate does pose a threat and endanger institutional security because prison gangs endanger institutional security. In other words, prison officials did not have to prove that the individual engaged in a criminal act or an act that warranted a disciplinary write-up in order to validate him as a gang member or associate.

Andrade also has failed to raise a triable issue of fact on the reliability of the evidence used to validate him. On the evidence in the record, no reasonable jury could conclude that the evidence did not have sufficient indicia of reliability. The court has reviewed *in camera* the confidential memoranda, mindful that Andrade will never be allowed to examine those materials himself. The confidential memoranda meet the "some evidence" standard and have sufficient indicia of reliability. The confidential memoranda are constitutionally reliable, i.e., the memoranda contain some factual information from which the validating decision-maker reasonably could conclude that the information was reliable. *See Zimmerlee*, 831 F.2d at 186-87. The court also is satisfied that there is no safe alternative to *in camera* review.

Viewing the evidence and reasonable inferences therefrom in the light most favorable to Andrade, no reasonable trier of fact could find in his favor on this claims that he was denied an opportunity to present his views and that there was not sufficient evidence to support the validation decision. Defendants are entitled to judgment in their favor on the merits of Andrade's due process claims.

B.   Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Burns v. Reed*, 500 U.S. 478, 495 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether the defendant is entitled to qualified immunity, the usual first step is to answer this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 194 (2001). If no constitutional right was violated if the facts were as alleged, the inquiry ends and the defendants prevail. As discussed above, no reasonable jury could conclude that defendants violated Andrade's due process rights on the evidence in the record. The inquiry thus ends and defendants prevail on the qualified immunity defense.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 52.) Defendants are entitled to judgment as a matter of law on the merits of the due process claims and on their defense of qualified immunity. Judgment will be entered in all defendants' favor and against plaintiff on his § 1983 claims. Having resolved the § 1983 claims, only state law claims remain, and the court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c)(3). The state law claims are dismissed without prejudice to plaintiff pursuing them in state court.

The clerk will close the file.

IT IS SO ORDERED.

Dated: October 18, 2013

_____
SUSAN ILLSTON
United States District Judge

12